UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

SARA LOPEZ
as parent and next friend of
JENNIFER LOTHES,
    Plaintiff

vs

BUTLER COUNTY JUVENILE
REHABILITATION CENTER, et al.,
    Defendants

Case No. 1:04-cv-508

Hogan, M.J.

**ORDER**

    Plaintiff Sara Lopez, as parent and next friend of Jennifer Lothes, brings this action pursuant to 42 U.S.C. § 1983 and Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 ("Title IX"), alleging a violation of her rights. This matter is before the Court on the parties' cross-motions for summary judgment (Docs. 30, 33), memoranda in opposition (Docs. 38, 39), and defendants' reply memorandum. (Doc. 42). This matter is also before the Court on plaintiff's motion for a continuance to submit the affidavit of Attorney Michael Hon (Doc. 45) and motion for co-counsel Michael Hon to withdraw. (Doc. 46).

    For good cause shown, the motions for a continuance to submit the affidavit of Attorney Michael Hon and motion for co-counsel Michael Hon to withdraw (Docs. 45, 46) are **GRANTED**.

    A motion for summary judgment should be granted if the evidence submitted to the court demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56. *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under

the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323.

A party may move for summary judgment on the basis that the opposing party will not be able to produce sufficient evidence at trial to withstand a motion for judgment as a matter of law. In response to a summary judgment motion properly supported by evidence, the non-moving party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *Sixty Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987); *Harris v. Adams*, 873 F.2d 929, 931 (6th Cir. 1989). Conclusory allegations, however, are not sufficient to defeat a properly supported summary judgment motion. *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1162 (6th Cir. 1990). The non-moving party must designate those portions of the record with enough specificity that the Court can readily identify those facts upon which the non-moving party relies. *Karnes v. Runyon*, 912 F. Supp. 280, 283 (S.D. Ohio 1995)(Spiegel, J.). "[A]fter a motion for summary judgment has been filed, thereby testing the resisting party's evidence, a factual issue may not be created by filing an affidavit contradicting [one's own] earlier deposition testimony." *Davidson & Jones Dev. Co. v. Elmore Dev. Co.*, 921 F.2d 1343, 1352 (6th Cir. 1991).

The trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial. *Anderson*, 477 U.S. at 249-50. In so doing, the trial court does not have a duty to search the entire record to establish that there is no material issue of fact. *Karnes*, 912 F. Supp. at 283. *See also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989). The inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 249-50.

If, after an appropriate time for discovery, the opposing party is unable to demonstrate a *prima facie* case, summary judgment is warranted. *Street*, 886 F.2d at 1478 (citing *Celotex* and *Anderson*). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## FACTS

Defendant Butler County Juvenile Rehabilitation Center ("Rehabilitation Center") is a multi-county community corrections facility ("CCF") for felony juvenile delinquents organized under Ohio Rev. Code § 5139.36 and Ohio Admin. Code §§ 5139-61, 5139-63, and established by an agreement between the Ohio Department of Youth Services ("DYS") and Butler, Clermont, Clinton, and Warren Counties, Ohio. Defendant Thomas W. Barnes is the Superintendent of the Rehabilitation Center and is in charge of its operation, including the enforcement of its eligibility criteria. Defendant Butler County, Ohio is a signatory to the Multi-County Agreement that establishes the Rehabilitation Center. In that Agreement, Butler County agreed to manage and operate the Rehabilitation Center for the use of all member counties. Each succeeding year, the Butler County Juvenile Rehabilitation Center produced a grant proposal to DYS. (Doc. 33, App. pp. 62 and 91). Upon approval, the Rehabilitation Center and DYS would execute a grant agreement that incorporated the terms of the grant proposal and required the Rehabilitation Center to hold DYS harmless for any violation of law. (Doc. 33, App. pp. 82 and 111).

The statutory purpose of a community corrections facility such as the Rehabilitation Center is to divert adjudicated juvenile felons from a commitment to the State Department of Youth Services. *See* Ohio Rev. Code § 5139.36(B)(1)(a). The Rehabilitation Center receives federal funds under the National School Lunch and Breakfast Programs, 42 U.S.C. § 1751 et seq., and the Child Nutrition Act of 1966, 42 U.S.C. § 1771 et seq.

The Rehabilitation Center first opened in 1992. It was originally a 46-bed facility, consisting of a separate ten-bed halfway house/group home, three ten-bed units, and one six-bed unit. A study conducted by the University of Cincinnati in 1999 concluded that the Rehabilitation Center was among the two highest-rated community corrections facilities in Ohio. (Doc. 33, App. p. 44). The study focused on recidivism, and found that Butler County Juvenile Rehabilitation Center graduates "had less than half the rates of recidivism of youths who completed the lowest-rated programs." (Doc. 33, App. pp. 44-5). The Rehabilitation Center's annual reports indicate that a substantial majority of the Center's residents improved their academic scores, participated in weekly individual and family counseling, received substance abuse education, performed community service, and avoided recidivism upon release. (Doc. 33, App. pp. 127-209).

In 1996, the Rehabilitation Center began accepting female juvenile offenders in an attempt to meet the goal of maintaining a 90% occupancy rate. The Rehabilitation Center operated its six-bed unit as its female unit, representing 13% of the total bed spaces. The operation of the six-bed female unit required at least four female youth leaders and a primary female therapist or case manager, regardless of the occupancy level of the unit. Staffing was the primary expense of operating the female unit.

4

The Rehabilitation Center's annual reports show that between June 30, 1996 and July 1, 2002, the Center admitted 455 juveniles, of whom 55, or 9% of the total, were female; an additional 4 females were admitted from July 2, 2002 and February 1, 2003. (Doc. 33, App. pp. 127-209). Superintendent Barnes testified that the Rehabilitation Center experienced a decreasing number of female offender referrals in the years preceding its elimination in 2003.

In fiscal year 2002, which concluded on June 30, 2002, the Rehabilitation Center's average daily population was 36 juveniles, leaving an average of 10 open beds. (Doc. 33, App. p. 182). A total of six females, or 7% of the total population, were admitted to the Rehabilitation Center during this period. In April 2002, pursuant to budget cuts by the Ohio DYS which were precipitated by the Rehabilitation Center's failure to maintain a 90% occupancy rate, the ten-bed halfway house/group home was eliminated, thereby reducing facility capacity to 36 total beds. Superintendent Barnes testified that even after the downsizing in 2002, the Rehabilitation Center could not meet its 90% occupancy requirement with the remaining 36 beds.

In August 2002, the Ohio DYS requested that the Community Corrections Facility directors consider and comment upon a proposed flat or reduced budget for Fiscal Year 2003. (Doc. 33, App. pp. 213-15). In response, the Rehabilitation Center indicated that a flat FY2003 budget would result in the possible elimination of the female offenders unit, and that a reduced FY2003 budget would result in the "[closure] of the six bed female unit or a 10 bed male unit. Hence, capacity will be 30 male beds, or 26-20 male beds and 6 female beds." (Doc. 33, App. pp. 213-15). In December 2002, DYS reiterated its expectation that community corrections facilities would maintain a monthly occupancy rate of 90% or risk refunding monies. (Doc. 33, App. p. 216). While the Rehabilitation Center had met the 90% quota in the beginning of 2002,

placements in the latter portion of the year had dropped below the quota. (Doc. 33, App. p. 217).

In January 2003, the Ohio DYS indicated that it would alter the way it applied the 90% occupancy requirement. Where DYS had previously examined the number of placements at the beginning of the fiscal year, it would now examine the number of placements at the beginning and the middle of the fiscal year. Superintendent Barnes objected to this change by email, stating:

> [W]e have maintained over 90% capacity the first six months, I want DYS to base the 90% on the entire year. Currently, we have 2 out of six female beds filled. There are no referrals from our region. However, we have two from Miami County-West Central's region. I have seven males on our waiting list. I have recommended to the Court Director's to eliminate the female offenders program to meet the 90% requirement. I don't want to go the first few weeks of the last six months of 03 with 5 beds for females unfilled. This will not benefit our budget. The rules of the game for 03 were to begin with the 90% requirement at the start of fy03 not in the last six months. I don't think changing rules in the middle of the game benefits our CCF. . . . If we had not maintained 90%, I would have a different opinion.

(Doc. 33, App. p. 217).

In February 2003, the Rehabilitation Center was notified of another round of budget cuts in the amount of $77,000.00, representing 5% of the Center's total budget for the year. The funding was to be eliminated in the fourth quarter of the year, and represented 30% of the funds for that quarter. At the time of notification, the female unit had only two out of the six beds occupied. Defendant Barnes made inquiries of the contributing juvenile courts and determined there would be no new female referrals. In addition, the two existing female residents were ready to leave the Rehabilitation Center. This anticipated level of vacancy would result in the Rehabilitation Center's occupancy rate at well below 90%, the rate required to avoid budget cuts. (Barnes Depo. at 43). A decision was made with the consent of the referring juvenile

courts and the Ohio DYS to close the female unit. (Barnes Depo. at 47-50, 60-61). This change was effective on February 1, 2003. (Doc. 33, App. p. 218).

From February 1, 2003 until October 2004, or for a period of 18 months, no female who lived in the Rehabilitation Center's region was placed in a community corrections facility. In Ohio, the State allows offenders from one county to be placed in community corrections facilities outside of its region. Defendant Barnes is aware of such placements having occurred on more than one occasion. (Barnes depo. at 101, 108). In October 2004 and April 2005, three females from the Butler County Juvenile Rehabilitation Center's region were placed at the Miami Valley Rehabilitation Center, a community corrections facility in Xenia, Ohio. (Doc. 33, App. p. 236).

On or about May 2004, Jennifer Lothes was adjudicated by the Butler County Juvenile Court, Case No. JV2004-1315, to be a delinquent child for committing the adult offense of felony burglary. At an initial dispositional hearing, the juvenile judge received evidence that Lothes and her mother had a strained relationship, and that Lothes had previously been a high-achiever, but had become lost during her adolescence. (Doc. 33, App. pp. 242-8). The judge acknowledged that a commitment to DYS would be counterproductive, and ordered a psychologist to make a dispositional recommendation. (Doc. 33, App. p. 247). At the sentencing hearing, after reviewing the psychologist's report, the juvenile court judge stated:

> [T]he young lady is in 'dire need of a placement in a highly structured and closely monitored environment. . . . [O]nce we go to DYS, it's almost like it's a throw-away; and I don't like to throw away anybody, but she's got an extremely difficult life ahead of her. The report here would indicate that . . . And I think she was brutally honest with Dr. Hopes in her responses to Dr. Hopes; and I think [s]he got     a real good picture of her. If we had rehab; yeah, I would like to
>        try it with her, but it isn't available for girls. And Dr. Hopes
>        doesn't have a whole lot of confidence, no matter what program

7

>
> she's going to go through.  And she says 'she has a poor prognosis
> for successful rehabilitation.'

(Doc. 33, App. p. 254).  Ms. Lothes was sentenced to a commitment with DYS for a minimum term of six months, and a maximum term not to exceed her twenty first birthday.  Lothes was assigned to DYS's Scioto Correctional Facility for Juveniles for a period of six months, then transferred to the Freedom Center, a drug rehabilitation facility, for a period of three months.

While at the Scioto Correctional Facility for Juveniles, Lothes went to school throughout the day and participated in group therapy.  She did not suffer any assault or abuse at the Scioto facility.  She testified that she benefited from the counseling and education she received at the Scioto Correctional Facility for Juveniles.  She could not identify any experiences she had at the Scioto Correctional Facility for Juveniles that she believed were harmful to her development, safety or well-being.

Sara Lopez, Ms. Lothes' mother, could not cite to any specific programs or services that she thinks would have been available to her daughter had she been placed at the Butler County Juvenile Rehabilitation Center as opposed to the Scioto Correctional Facility for Juveniles.  She testified that a local placement would have enabled them to engage in family therapy during her daughter's incarceration, as opposed to waiting until her release.  Ms. Lopez testified her daughter "did very well" in everything that was expected of her at the Scioto Correctional Facility for Juveniles, earning her an early release. (Lopez Depo. at 43).

Attorney Michael Hon, plaintiff's criminal attorney in her delinquency case, Case No. JV2004-1315, avers that he was employed as an assistant prosecutor assigned to the Butler County Juvenile Court from 2001 to 2004, and during that time no female was ever placed outside of Butler County for rehabilitation. (Doc. 45, Hon Aff. ¶7).  He further states that during

his representation of Jennifer Lothes, no person ever told him of the availability of a rehabilitation placement outside of Butler County. (Doc. 45, Hon Aff. ¶12). He also avers that based on his experience as an assistant prosecutor and private practitioner, he had no reason to know of or to investigate the possibility of a rehabilitation placement outside of Butler County. (Doc. 45, Hon Aff. ¶13). Mr. Hon states that he "was told by the trial judge that rehabilitation does not accept girls" and "[t]hat it was up to this very judge to determine Lothes' disposition." (Doc. 45, Hon Aff. ¶¶14-15).

Plaintiff alleges that Lothes' placement at DYS resulted in the deprivation of benefits available to boys at the Butler County Juvenile Rehabilitation Center, to wit: (a) a diversion from a commitment to DYS, (b) educational and counseling services, and (c) an enhanced opportunity to successfully re-integrate into the community upon release. Lothes alleges that her exclusion from participation in the Rehabilitation Center, an educational program and/or activity that receives federal assistance, was based on her gender. She alleges that she was denied the services afforded to similarly situated boys, which resulted in a placement that was more detrimental to her development, safety, and well-being. Plaintiff contends that the Rehabilitation Center's elimination of the female offenders program from a juvenile Community Correction Facility violates Title IX of the Education Amendments of 1972 and the Equal Protection Clause of the United States Constitution.

## **TITLE IX CLAIM**

Title IX of the Education Amendments of 1972 provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be

subjected to discrimination under any education *program or activity* receiving Federal financial assistance." 20 U.S.C. § 1681 (emphasis added). A "program or activity" under Title IX is defined as follows:

> For the purposes of this chapter, the term "program or activity" and "program" mean all of the operations of–
>   (1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or
>   (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;
>   ....
>   any part of which is extended Federal financial assistance, except that [stating an exception that does not apply in the present case].

20 U.S.C. § 1687. "[T]he purpose of § 1687 was 'to make clear that discrimination is prohibited throughout entire agencies or institutions if any part receives Federal financial assistance.'" *Klinger v. Department of Corrections*, 107 F.3d 609, 615 (8th Cir. 1997). In *Klinger*, the Court of Appeals held that the subset of the State of Nebraska's prisons comprised of its women's prison and a single, particular male prison did not constitute a "program or activity" under Title IX. Rather, the Nebraska prison system as a whole qualifies as a "program or activity" within the meaning of the statute. *Id*. at 615. Thus, in analyzing the plaintiffs' claim of inequality under Title IX, the *Klinger* Court held that "Title IX requires comparison of educational opportunities for female and male prisoners within the entire system of institutions operated by a state's federally-funded correctional department or agency, taking into account the objective differences between the male and female prison populations and such penological and security considerations as are necessary to accommodate in this unique context." *Id.* at 616, citing *Jeldness v. Pearce*, 30 F.3d 1220, 1228-29 (9th Cir. 1994)(taking into consideration differences

between circumstances of female and male prison populations in Oregon prison system and holding that "[a]lthough the programs need not be identical in number or content, women must have reasonable opportunities for similar studies and must have an equal opportunity to participate in programs of comparable quality"). The Eighth Circuit went on to state:

> This is not to say that no comparison can be made, consistent with Title IX, where there are significant differences between male and female prison populations within a state's correctional system, such as unequal population sizes and lengths of stay. Rather, equal opportunities must be afforded consistent with those differences. *See id.* Because plaintiffs' comparison of the educational opportunities at NCW [the women's prison] to those at NSP [one of several male prisons] fails to provide a meaningful comparison of educational opportunities for male and female prisoners in the Nebraska prison system as a whole, the district court correctly concluded that plaintiffs' evidence was not sufficiently relevant or persuasive to prove a violation of Title IX.

*Klinger*, 107 F.3d at 616.

In this case, plaintiff contends she was denied admission to and a reasonable and equal opportunity to participate in the "rehabilitation program" at the Butler County Juvenile Rehabilitation Center because the Center did not accept female juvenile offenders. (Doc. 38 at 2). The Rehabilitation Center, however, is not a "program or activity" within the meaning of Title IX. Rather, it is one of several community corrections facilities within the ambit of the Department of Youth Services. For purposes of Title IX, the "program or activity" is the entire system of juvenile institutions operated by the Ohio DYS. *Klinger*, 107 F.3d at 615. *See* 20 U.S.C. § 1687(1)(A) (the term "program or activity" means "all of the operations of . . . a department, agency, special purpose district, or other instrumentality of a State or of a local government" which receives federal funds). Thus, the fact that plaintiff may have been denied admission to a particular community corrections facility because of her sex does not resolve the Title IX issue before this Court. Rather, the Court must compare the educational opportunities

afforded to females and males throughout the DYS, including those at the community corrections facilities, and not simply examine the opportunities solely available at the Butler County Juvenile Rehabilitation Center.

Plaintiff contends that by virtue of her placement at the DYS's Scioto Correctional Facility for Juveniles, she was deprived of benefits available to boys at the Butler County Juvenile Rehabilitation Center, including a diversion from a commitment to DYS; educational and counseling services; and an enhanced opportunity to successfully re-integrate into the community upon release. In making the comparison between the opportunities available to females and males in the DYS system, the Court must consider the context of the prison setting:

> If an education program takes place in the prison, exclusion of women from a particular class solely because women do not reside at the prison offering that class is not improperly segregating 'separately on the basis of sex,' but it is rather an activity 'separately on the basis of location.' The prohibited activity would be the offering of educational programs only in the men's prisons, without offering equivalent programs in the women's prison. In that case, women would be 'denied the benefits of a program' on account of sex.
>
> Strict one-for-one identity of classes may not be required by the regulations. But there must be reasonable opportunities for similar studies at the women's prison and women must have an equal opportunity to participate in educational programs. For example, the apprenticeship programs offered to men and women could perhaps differ depending on interest and need, but totally denying women access to half the apprenticeship opportunities men have would seem to violate the regulations.

*Jeldness v. Pearce*, 30 F.3d 1220, 1229.

In the instant case, plaintiff has failed to meet her burden of showing that she has been denied educational programs or activities on the basis of her sex in violation of Title IX. Plaintiff has failed to show that female residents of the DYS are afforded educational and counseling opportunities unequal to those of their male counterparts. Plaintiff testified that while

12

she resided at the Scioto Correctional Facility for Juveniles, she attended school throughout the day and participated in group therapy, and that she benefitted from the counseling and education she received. Plaintiff also received drug rehabilitation for a period of three months at a facility "outside" the Scioto facility. While plaintiff's mother testified a local placement would have enabled them to engage in family therapy during her daughter's incarceration, as opposed to waiting until her release, the lack of family therapy in itself does not violate Title IX. Title IX does not mandate "strict one-for-one identity" of classes or programs, nor require that programs be identical in number or content. *Jeldness*, 30 F.3d at 1229. Moreover, although boys at the Rehabilitation Center may have had the opportunity for family therapy by virtue of their proximity to their families, there is no evidence that the Scioto facility lacked opportunities for family counseling.[1] As such, this would be an activity or program "not improperly segregat[ed] 'separately on the basis of sex,' but . . . rather an activity 'separat[ed] on the basis of location.'" *Jeldness*, 30 F.3d at 1229. In addition, to the extent plaintiff contends that placement at the Rehabilitation Center would have "enhanced" her opportunity to successfully re-integrate into the community upon release, presumably based on the 1999 University of Cincinnati study showing the rate of "success" of the Center, she has failed to show how any particular rehabilitation program or activity that existed at the Rehabilitation Center in 1999 when the study was conducted is qualitatively different from those programs she participated in at the Scioto Juvenile Correctional Facility. The fact that juveniles placed at the Rehabilitation Center in 1999 may have had less recidivism than others in another community corrections facility or a DYS Correctional Facility does not in itself imply that the educational programs or activities

---

[1] Ms. Lopez's testimony indicates family therapy was available, but unrealistic given the distance between her home and the Scioto Facility. (Lopez Depo. at 38).

over the entire system are unequal on the basis of sex.

To the extent plaintiff contends that the Rehabilitation Center and Butler County have failed to make their program, or community corrections facilities, equally available to females (Doc. 33 at 8), the record does not support plaintiff's contention. The undisputed evidence shows that the Miami Valley Juvenile Rehabilitation Center, a community corrections facility in Greene County, Ohio, would accept youth from non-participating counties, space permitting. (Doc. 33, App. at 229). During 2003 and 2004, the Miami Valley Juvenile Rehabilitation Center was ready, willing and able to accept referrals for juvenile offenders from other counties, including Butler County. (Doc. 39, Neidenthal Aff. ¶5). Had a referral been made in May 2003 for a female from Butler County, the Miami Valley facility would have accepted her pursuant to their standard acceptance procedures for accepting any referred juvenile. (Doc. 39, Neidenthal Aff. ¶6). Plaintiff contends that Miami Valley accepted three Butler County females only after this lawsuit was filed. However, plaintiff has presented no evidence disputing the fact that State law at the relevant time provided for and permitted out-of-county placements, *see* Ohio Rev. Code § 5139.36(E)(3), and that Miami Valley had the bed space and was willing to accept a female referral from Butler County. (Doc. 39, Neidenthal Aff. ¶6). The Miami Valley community corrections facility offered the same rehabilitative and counseling programs that plaintiff sought from the Butler County Rehabilitation Center. The fact that neither plaintiff's criminal attorney nor the juvenile court judge were cognizant of such an available placement does not negate the fact that Ohio law explicitly permitted such placement or the fact that space in another community corrections facility was available for a female. Plaintiff cannot simply establish a Title IX claim based on her criminal attorney's or juvenile judge's ignorance of the

14

law.

For the foregoing reasons, the Court finds plaintiff has failed to show she was denied educational opportunities in violation of Title IX "on the basis of sex." Therefore, plaintiff's motion for summary judgment is denied and defendants' motion for summary judgment is granted on plaintiff's Title IX claim.

## EQUAL PROTECTION CLAIM

Plaintiff contends that the categorical exclusion of females from the Butler County Juvenile Rehabilitation Center violates the Equal Protection Clause. She asserts that the purported justification for the exclusion of females from the Rehabilitation Center, *i.e.*, the preservation of limited funds, while an important governmental objective, is not substantially related to the means employed to achieve that objective. Plaintiff states she is not asserting that the Rehabilitation Center administered a separate but unequal rehabilitation program. The gravamen of plaintiff's equal protection claim "is that she was denied *any and all access* to a unique, successful, rehabilitation program at [a] state institution, *co-ed or not*, on the basis of her sex." (Doc. 38 at 3).

The equal protection clause requires that "all persons similarly circumstanced shall be treated alike." *F. S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920). In the context of a prison system, the Equal Protection Clause does not require that men's and women's prisons have identical programs, but rather programs which are "substantially equivalent." *Glover v Johnson,* 478 F Supp 1075, 1079 (E.D. Mich. 1979)("equivalent in substance if not in form"); *Canterino v. Wilson*, 546 F. Supp. 174, 210 (W.D. Ky. 1982) ("[T]he equal protection clause

requires parity, not identity, of treatment."), *as amended*, 562 F. Supp. 106, *aff'd*, 875 F.2d 862 (6th Cir. ), *cert. denied*, 493 U.S. 991 (1989). "Disparate treatment is the initial element of an equal protection claim." *Glover v. Johnson*, 198 F.3d 557, 561 (6th Cir. 1999), citing *Bannum, Inc. v. City of Louisville, Ky.,* 958 F.2d 1354, 1359 (6th Cir. 1992). Where a district court concludes that parity of treatment exists, however, the Court need not analyze whether the challenged governmental action or regulation is substantially related to an important governmental objective. *Glover*, 198 F.3d at 561, citing *Sullivan v. City of Cleveland Heights*, 869 F.2d 961, 964 (per curiam).

In the instant case, plaintiff contends she was denied access to any actual rehabilitation program because of her sex. However, the undisputed evidence shows that plaintiff received educational, counseling, and drug rehabilitation services while at the Scioto DYS. Plaintiff has failed to show how the services she received at that facility were somehow deficient vis-a-vis the programs offered at the Butler County CCF.

More importantly, the evidence shows that the rehabilitation programs available at the Miami Valley CCF for both males and females were the same as those available to males at the Butler County Rehabilitation Center. The evidence also shows that females were, under Ohio law, permitted to be transferred to a CCF outside of their home county and that the Miami Valley facility was available for such a transfer at the time of plaintiff's sentencing. Although the juvenile court judge who sentenced plaintiff made the comment that "rehab . . . isn't available for girls" and her criminal attorney was unaware of such availability, this evidence in itself does not present a material issue of fact for purposes of the summary judgment motions because the record taken as a whole could not lead a rational trier of fact to find for plaintiff on this issue.

*Matsushita*, 475 at 587. When the decision was made to close the female unit at the Butler County Juvenile Rehabilitation Center, it was made with the consent of the referring juvenile courts. (Barnes Depo. at 47-50, 60-61). The juvenile court judge in plaintiff's case was no doubt aware of the closure of the female unit at the time he sentenced plaintiff. Nevertheless, it is undisputed that Ohio law specifically provided for out-of-county placements at the time of plaintiff's sentencing. Plaintiff fails to present any evidence that she made a specific request for an out-of-county transfer and that such request was denied. Had she done so, this may have been a different case. The evidence further shows that the Miami Valley facility was available for an out-of-county female transfer at the time of plaintiff's sentencing. The fact that neither the juvenile court judge nor her criminal attorney at that time explored the possibility or potential of an out-of-county transfer to a CCF does not negate the fact that it was available to her.

In addition, plaintiff contends the Butler County Juvenile Rehabilitation Center failed to make any effort to ensure that the females from its region would have access to rehabilitation at another CCF. However, plaintiff fails to present any evidence showing the Butler County facility was in fact responsible for placement of juveniles at any other facility. Ohio law specifically provides that commitments and referrals of juveniles to CCFs are made by the juvenile court and the DYS. *See* Ohio Rev. Code § 5139.36(E)(2); Ohio Admin. Code § 5139-36-01(K). Plaintiff fails to present evidence showing the Butler County Juvenile Rehabilitation Center had either the authority or the responsibility to ensure her placement at another CCF. Because plaintiff had available to her a rehabilitation program that was substantially equal to that offered at the Butler County Juvenile Rehabilitation Center, she has failed to show disparate treatment in this case. Therefore, the Court need not engage in the next

step of the equal protection analysis and determine whether the elimination of the female unit at the Butler County Juvenile Rehabilitation Center was substantially related to an important governmental objective.

For the foregoing reasons, the Court finds that plaintiff fails to establish her equal protection claim as a matter of law. Accordingly, plaintiff's motion for summary judgment must be denied and defendants' motion for summary judgment must be granted on plaintiff's equal protection claim.

**IT IS SO ORDERED**.


Date:   2/24/2006            s/Timothy S. Hogan
                             Timothy S. Hogan
                             United States Magistrate Judge